Cork v. CC-Palo Alto, Inc. My name is Anne Marie Murphy and I represent the appellants who are residents of the V. Palo Alto Continuing Care Retirement Community, known as the CCRC. Each of the plaintiffs in this case was required to pay a substantial entrance fee in order to live at V. Palo Alto. These entrance fees range from several hundred thousand to several million. And if I could back up for a minute, I would like to reserve three minutes. Essentially, these entrance fees are no interest loans, zero interest loans that are made by the residents to the provider, CC-Palo Alto. The majority of the entrance fee is refundable when the resident leaves the unit and leaves the community. There are several things that are at the heart of this case, including the fact that the CC-Palo Alto fails to keep legally required reserves held in trust to protect the entrance fee refund obligations that it owes to its residents. Also at the heart of the case is the practice of CC-Palo Alto, its so-called cash management practice of transferring available funds on a very short look-forward basis to its parent in Chicago, to CC Development Group, keeping the community in a constant state of financial distress. Also at issue is the parent, CC Development Group's statement that it owes no legal obligation to the residents to ever repay entrance fee obligations as they become due. Appellants are now left living in a financially unsound community. We argue a community that's insolvent as part of our derivative case. While it is true that CC-Palo Alto has not failed to make entrance fee repayments as they come due, it is foreseeable that there will be defaults in the future. In fact, the appellees belittle the concerns of the appellants in this regard. The appellants have identified a number of foreseeable events that could lead to default, including a large earthquake, after all, the community is on the San Andreas Fault, or a pandemic. So maybe you could just zero in on what was of concern to the district court, which was you were just alluding to that CC-Palo Alto has made the payments. Nobody has been denied a payment. Nobody's awaiting payment, as the district court said, but the district court was very much concerned that there was a lack of injury, a lack of real harm to support standing. So what's wrong with that? Sure, I'd be happy to address that. So there is... Well, that's what the district court... That's what you got to convince us that the district court was wrong in that analysis. Well, and like I said, we admit that to date, the entrance fee payments have been repaid as they come due, but not without some trouble, and including the fact that there's had to be transfers of funds back down from the Chicago parent to the subsidiary, even though the parent has told the residents they have no legal obligation to do that. The other way to look at this, the current present injury that exists now, the harm, is the significantly increased risk of default. The other present harm that exists today for each of my clients is the lack of financial security. They're living in a financially distressed community. When they were sold on the promise that they would be living in a financially well-off and stable, well-run community, instead, the community has been in a constant state of financial distress. So that is the present harm to the residents. So how does that relate to the alleged obligation of C.C. Palo Alto to create a reserve fund with the potential... So they have a fund available to reimburse or to refund or repay, whatever it might be. Any deposits? Sure. If I could take a moment, I'd like to walk through how the reserve issue comes to play. So in California, we're looking at the Health and Safety Code and Section 1770 in sequence, which we refer to as the CCRC law. It is a remedial statute designed specifically to protect the residents of CCRC communities. The legislature, in the legislative intent stated in the statute, noted that residents often expend a significant portion of their savings to enter these communities, i.e., these entrance fee payments, and that tragic consequences can result if a provider becomes insolvent or unable to provide responsible care. The statute, because it's remedial, needs to be interpreted broadly, and it, in fact, in 1775E expressly states that it is to be interpreted broadly for protection of residents. So... Can I ask a specific question about refund versus repayable? Sure. I think in order for you to succeed, this has to be a refund situation and not a repayable situation. That's what triggers the need to have the reserve fund, correct? That's correct, and that has been an ongoing debate. You have the... Originally, the agency in California that was in charge of this felt this was refundable, but then they decided it was really repayable because of the time lag between the sale and the need to refund, correct? Do I have that right? Correct. That is correct. Okay. So that's what they decided. So what are we supposed to do with the decision of the California agency in charge of this that thinks this is a repayable contract now because of that time lag? Okay. Well, a couple points in response to that. Judge Davila, our district court judge, fairly easily recognized that these contracts were, in fact, refundable as that term is defined. And can I just say that that was before the agency decision, correct? I can't say that for sure. It may have been. I think it's a separate issue, though, because he looked at the statute and found that it was unambiguous, and we think it plainly... The repayment obligation is not contingent. It is absolute, no matter what those refunds will be due to departing residents. So what you're saying is that whatever the agency did, the district judge would have come out the same way because he finds the statute unambiguous, correct? Correct. But if I may, if we're going to go down the path of saying that the statute is ambiguous, then we need to look at the level of deference that agency opinion should be given. The DSS actually flip-flopped. Originally it said they didn't qualify as refundable contracts, then they do have to keep a reserve, and then they flipped again and said they don't. And you look at Chevron deference and Skidmore deference when you find that the statute is ambiguous, which again, we don't think you need to get there. But if you do need to get there, the analysis would be under the Skidmore, and you would look at whether the agency's interpretation was reasonable. And you would also look at whether the opinion was thorough, valid, and there was consistencies Why wouldn't we apply California law on that question? Why would we be looking to Chevron and Skidmore? California has their own law on how to interpret their, how to interpret a state administrative determination. Well, I think that the same principles apply. We're not dealing with an actual decision of the DSS. We're talking about informal letter opinions and a memorandum that, on its face, the analysis is flawed because the statute is not ambiguous. Excuse me. So the district court in this case was under no obligation to pay any deference to the agency responsible for administering this program in interpreting the very language you're discussing? Our position is no, because the statute is unambiguous. That's what he said. That's what the district court said. Well, he did defer to the agency. But to be clear, our position is it was error to defer to the agency because the statute's unambiguous. Can we go back to Judge Rastani's question? The agency did change its mind in this regard. Did Judge Davila have before him the last interpretation? I would have to check the record. I don't think it's... My colleagues probably know the answer, but I don't believe that that was a critical point to the district court. Well, that doesn't really answer the question. We just don't... I don't recall that... Judge Davila certainly didn't refer to the most recent interpretation in his analysis. Which suggests that he may not have had it. I don't believe he referred to any of the analysis one way or the other, but he did defer. He thought this was something that should be left to the DSS, admittedly. He did say that. Counsel, finish this sentence for me. My clients have been injured in the precise, concrete way by... Finish the sentence. My clients have been injured in the concrete way that they do not have a statutorily mandated reserve held in trust for them, and they have been injured because they are now living in a financially unstable community and have significant concern that there will be defaults in the future. Let me... I guess... Maybe if it's okay, I can turn to the insolvency issue. Judges, is that okay? Sure. All right. You seem to be insisting that the going concern valuation, and particularly the use of the... What do you call it? The discounted... Cash flow. Thank you. The discounted cash flow is inappropriate, but it seemed to me that in this kind of situation, the district court actually listed a number of reasons why that was exactly the right way to value this and determine insolvency. So, what exactly is wrong with using that... With relying on that kind of method in this situation? I didn't get why that was wrong from your filings. Sure. If I could unpack that a little. So, discounted cash flow is one of the recognized ways, valid ways, to analyze solvency in a credit or derivative case, but that is not the only way. The seminal cases are the quadrant cases, and those talk about both a cash flow and a balance sheet test being appropriate. In addition, I think the other way I want to answer this is if you look at the expert reports that we provided, we provided an expert who pined on solvency. We also provided an expert analyst from an actuary who specializes in continuing care retirement communities, and we also looked at the leasehold value. So, our expert did, in fact, look at the future projections and the value of the incoming entrance fees, and did look at the actuarial reports that had been prepared on behalf of the providers, and did look at and pine on the fact that the company's projections had not come to pass. So, the two points I want to make is a DCF analysis is not the only method that's valid in this situation. If it's not the, but why is that the question? Isn't the question, if it's one valid way, and the district judge selected that way, why does he have to select your way? I don't get what was wrong with the way he did it. Well, because, okay, I believe that in what we prepared and submitted through our experts, there was sufficient detail that is consistent with a discounted cash flow analysis. And our expert, Ms. Hill, included several different methods of looking at the situation, including the balance sheet test and the cash flow test, which are the correct, only the two methods mentioned by the quadrant cases, the creditor-derivative cases, which I think is important to note. And she looked at the actuarial information, both from our own actuarial expert and that of the V. So, I think regardless of which test the court applies, we've met that test with that analysis that's been provided. This is not a close-call situation, where it's a close call about whether the company is solvent or insolvent. C.C. Palo Alto, at the time we were briefing this, had a negative net worth of $317 million, and long-term repayment obligations to residents of a half a billion dollars. Unless there's further questions, if I could reserve the remaining minutes. Yes. We'll hear from the defendant. Good morning. My name is Gil Sirota. I'm the counsel for the individual defendants. My clients were the officers and directors of C.C. Palo Alto, who won summary judgment on the issue of solvency. And the sole question on appeal for my clients is whether the district court abused its discretion in finding the solvency evidence submitted by plaintiffs to be inadmissible. Because if they can't meet their burden of proof on solvency, they have no standing to sue derivatively. Mr. McManus is going to follow me and take up the other issues dealing with the direct claims against the corporate defendants. Let me start with the threshold issue in a solvency or valuation context. And that is the question of whether the corporation in question is a going concern. Here, plaintiffs and us and the court found that C.C. Palo Alto was a going concern. In that regard, there was no dispute about the fact that it had paid all its bills on time in full. It had met every entrance fee repayment obligation on time. The new entrance fees coming in were greater than the entrance fees that it was paying to terminating residents. It had zero construction or operating debt. It had paid off all its construction loans and returned to its parent its initial capital contribution, distributed excess cash, and still had, at the time of the suit, $20 million in cash. The negative net worth that counsel referred to is simply a gap, general accounting principle, entry that records distributions of excess cash to the parent company as a negative number. And actually, that is an indicator of financial success. It means the business model was working to the extent that they could pay all their bills and still send the parent company some cash distributions, which, of course, is what a parent company is supposed to do. And in light of those undisputed facts, it was ludicrous, ludicrous from the start to claim that this company is in financial distress or insolvent. So if you have a going concern, the valuation or solvency analysis is a discounted cash flow analysis which looks at the cash generation of the corporation, discounts it to present value. Included in that was the ground lease obligations and how that changed it over time. There were 60 years left on the ground lease at the time of this valuation. And what a discounted cash flow does is it results in a fair market value balance sheet. When counsel says that a balance sheet analysis is proper, she forgets to tell you that it's a balance sheet analysis of fair market value, not the numbers on a gap sheet. In fact, the very cases that she refers to from Delaware, the quadrant cases, say you don't give weight to the gap balance sheet. You adjust those values to fair market value. What her experts failed to do, among many calculation mistakes that they made, was to take into account the present value of the cash flow, the goodwill, the intangible assets of a going concern which make it more valuable than the sum of its parts. And what the district court did here in rejecting the failure to produce a proper cash flow analysis or the other types of analysis, comparable company or market value, which are also allowed, which they didn't even attempt to do, was 100% proper. And it's supported by cases we cited in our brief like In Re Med Diversified and Solvency Analyses like those that came in here. I want to mention one other thing counsel said. Well, they had to look to the parent from time to time for funds. Every operating company has a line of credit that from time to time it calls upon when short-term needs exceed their projections. Here our client had a parent company. It didn't need a line of credit. So in 17 years of operation, two or three times it received a few hundred thousand dollars to pay some unanticipated bills. That has zero relevance in a solvency analysis. And finally, counsel talked about the actuarial study. The actuarial study found our client in compliance except for one test. The one test was a test in which it looked at outgoing entrance fees without taking into account incoming. And a discounted cash flow analysis looks at incoming as well as outgoing. And Milliman who conducted that solvency analysis wrote a letter. It's in the record. It was taken into account by the district court judge which said you should not consider this study to be any evidence of solvency or insolvency. And Judge Davila took that into account in rejecting their evidence. So there is simply no way that you could find that he abused his discretion in making these determinations. And in fact, this was a non-jury trial. And he could have made the same determination at trial that he made on summary judgment in simply finding their solvency evidence to be unpersuasive or inadmissible. I'll pass the virtual podium now to my colleague, Mr. McManus. Okay. Thank you. Good morning. This is Jim McManus down here in San Jose. I represent the company defendants. And as the last guy in line, I don't have a lot to say. But I would like to talk about two things. First, the absence of a private right of action for cases like this. And secondly, the lack of standing for the plaintiffs to even be in federal court. Continuing care retirement communities, which we call CCRCs, are one of the most highly regulated industries in the state of California. And the agency charged with overseeing this industry is the Department of Social Services, abbreviated DSS. Starting with Health and Safety Code section 1770, we see some 250 pages of text and who knows how many regulations covering every aspect of a CCRC. And just to give a few examples, before a CCRC can even begin operations, it has to get a certificate of authority from the agency. Before it offers any contract to a resident, that has to be approved. It has to make disclosures to the agency, disclosures to the residents, reports on a regular basis, both to the agency and the residents, and submit annually audited financial statements. It oversees every aspect of operations, and it may intervene in the interests of the residents at any time if it believes their health and safety requires it to do so. And I refer you to section 1793.21, where there are like 22 instances listed of where the department may act. The enforcement of the statute and regulations is entrusted to the department and the California Attorney General. There is only one section of this comprehensive statutory scheme where a resident is afforded a private right of action, and that's section 1793.5d. That is where a provider, quote, abandons a continuing care community or its obligations under a contract. Judge Davlin determined that this section applies, and I quote from his opinion, quote, only where the entity has abdicated its responsibilities to the community in such an egregious manner that it rises to the level of criminal liability. Can we break that down for just a minute? Yes, sir. So first of all, does your argument turn on whether this is a refundable contract or a repayable contract? We don't think it matters, and on that point I'd like to say, because there may be some confusion here, Judge Davlin addresses this issue at pages 16 and 17 of his order. On a personal note, he's one of my favorite judges, but even a great umpire sometimes misses the call. And I think if they have, if you conclude, and this is independent review or de novo review, I believe, that it is a repayable contract as the Department of Social Security, Social Services, pardon me, states, that's the end of the case as far as this part of the case is concerned. So if it's a repayable contract, then they don't have to maintain the reserve? That's correct. Right, and then therefore their claims basically fall apart, correct? Absolutely, absolutely. Now if it's a refundable contract, then it seems that they're obligated to maintain a reserve. Well, there are reserves that are maintained, and the question becomes, what's the amount of the reserve? And Mr. Sirota, my colleague's comments bear some consideration in that regard. I don't understand why you just can't answer yes to that. If it's a refundable contract, they're required to make the reserve provided for in, I forgot the statute, but it ends in .6 I think. Isn't that the law? If it's a refundable contract, they have to maintain the reserve. I don't know. I can't answer that question. You're correct. The answer is yes. Okay, the answer is yes. All right, thanks. So if they're not maintaining the reserve, why couldn't that qualify as an abandonment of one of its obligations? Well, an abandonment, as Judge Dablow observed, is more than just simply not, well first of all, I want to emphasize that we disagree with this conclusion. I understand that. All right, fair enough, and all I'm saying is an abandonment of a community is like walking away from the community, and it's not simply an obligation. The code specifically talks about obligations in a plural, and an abandonment of a community, as Judge Dablow said. They may not be able to prove their claim, but this is just for purposes of standing. I mean, they allege, essentially, that you had an obligation, assuming that it's a refundable contract, the plaintiffs allege that you had an obligation to maintain a reserve, and that, as I understand it, that you essentially abandoned that by not maintaining it, and therefore, under the statute, there is a remedy for them, there is a cause of action, and when you look at standing, it provides, there's a statutory basis for their claim, which provides the basis for a standing argument, which Judge Dablow, he added all this other language about, well, it only is an abandonment if it rises to the level of a criminal kind of conduct, and I don't see how he read that into that particular statute. Well, I mean, I think you put your finger on the heart of the matter, whether this constitutes an abandonment of the community, and its contractual obligations, or its contractual obligations, or, correct, thank you, or its contractual obligations, and I don't think that it does. Well, but see, that's what I mean. They may never be able to prove their claim. They got kicked out on standing. Their claim may fail from the get-go, because it looks like, you know, as Counsel just was explaining to us, the parent, when C.C. Palo Alto needed money to pay reserves, they didn't have it, the parent helped them out, you know, which is what a good parent would do, I guess. Is that right? No, I don't know. So they may not be able to prove their claim, but what I'm concerned about now is the District Court knocked him out on standing. Well, I think the District Court... You don't even belong here in federal court on this claim. That was one of the grounds that Judge Dablow cited for dismissing their complaint. He also concluded that this was something... But he only did that with respect to the first ten causes of action. That's correct. Because they were tied to this idea about the reserves. And he said, those ten claims, no standing, no harm, you're out. And then he had the claims regarding fraudulent transfer and the derivative claims. Those he went on and dealt with. Well, that's correct. Let me turn to the question of standing then. Because if you look at the allegations of the complaint, there are no allegations that there has ever been a failure of payment. There's no allegation that there has ever been even a contract termination by these plaintiffs or anybody else. There's no allegation of a delay in repayment of the entrance fee. There's no allegation there have been untimely payments. There are no allegations that these residential units are not reselling, which is critical to repayment. Can I ask you a question? I think the argument of your opposing counsel is that by law, they're entitled to a certain level of security. And that security is missing. And I don't mean security in a technical sense. I just mean that they are entitled to have this peace of mind, this protection. And she said that's what they're entitled to. And why is the loss of that not an injury? In my view, it's not actual. It's not concrete. There is no harm, either actual or threatened. It's hypothetical. It's conjectural. The fact of the matter is that there's never been a problem with this community. And I don't expect that there ever will be. And it's in order to have standing, not only do you have to have a legislature, the legislature has to create the right, but it has to create a private right of action. Now, I take it Judge Pires is not convinced by Judge Davila's comment or mine about the total abdication of responsibility of walking away from the community. Fair enough. But the point here is, even if you say, well, they have a right, and they have a private right of action, which we question, there's no concrete harm here. And simply not complying with that one provision, which we agree, which we dispute is even applicable here, doesn't give them standing. Nobody ever says, but how much are these entrance fees? Does it depend on the size of the unit? There's references in the paper, like hundred thousand, millions, billions of dollars. They vary with the size of the unit. And it's very, very expensive. And these are very, very accomplished people who are living in a lovely facility with enjoying all the benefits. That's why I have to say, when we talk about, you know, abdicating a responsibility or abandoning the community, nothing could be further from the truth. This is a thriving community that's providing a nice life for these people. And there's been absolutely no, as I say, harm, actual, imminent, threatened, or otherwise. In short, if I may, any harm here is speculative, conjectural, hypothetical. It's not a substantial one based on concrete facts. And if you could conjure up some specter of harm here, it could certainly not be said to be certainly impending. In fact, it's certainly not impending. Look, I'm reminded of something in the footnotes in the Clapper case, where the court characterized the concerns of the plaintiffs there as based on their subjective fears. And with respect, I submit the same applies here. As the oldest person on this call, I'm sympathetic to the worries of these plaintiffs. That said, we live in a country which is still subject to the rule of law, may it ever be so. And however sympathetic we may be to their case, it's not one that belongs in federal court. Can I just interrupt you for one second? I have one minor procedural kind of question for you. It relates to the letter by the Department of Social Services. And I think I found the letter in my iPad record here. And what it appears is that in August of 2016, it looks like it came after Judge Davila's ruling, there was a letter of inquiry submitted to Department of Social Services by the plaintiffs asking DSS to crack down on and to force C.C. Palo Alto to maintain a reserve. And then there was a response by the general counsel from the parent, I think it was, according to this letter, maybe even from C.C. Palo Alto as well, where there's an exchange that goes back and forth. And eventually they offer this letter and they say, you know, we said one thing once before, but now that we're looking at it again, this looks like it's probably a repayable contract. And they say it has incidents of both, refundable and repayable. This time they say, well, we think this is repayable and you don't have to maintain a reserve. Was this ever brought back to Judge Davila's attention? Not to my knowledge, but in answer to your question, there was a complaint made to the DSS in the form of a letter from opposing counsel, not Ms. Murphy, but her colleague. DSS conducted a thorough examination of this, as it's required to do under the statute. And as I counted the DSS correspondence, there were numerous letters going back and forth. There were meetings with the plaintiffs. And at the end of the day, they concluded, as the agency charged with the responsibility of regulating this care center, that there was not a problem, that it was a repayable contract, which you'll decide after your review of the statute, and that there was no need for a reserve. You know, in the reply brief, the plaintiffs say that this court should permit these residents to enforce their contracts in a court of law. This, of course, would ignore the comprehensive scheme of the statute. They go on to say, otherwise, appellants and all other California CCRC residents will be deprived not only of their right to enforce their contracts, but of any real remedy for breaches. There are 109 CCRCs in the state of California. And if this court were to accede to the plaintiffs' request, not only would it be rewriting 250-plus pages of a statute that the California legislature enacted, but it would also be opening the doors of federal courthouses up and down the state to all kinds of contractual claims by CCRC residents for various grievances, real or imagined. I'm very certain. All right, so the bottom line, this letter was never brought to Judge Davila's attention. Not to my knowledge. Okay, thank you. And I think you're out of time. I'm out of time. Thank you. Thank you. There's a lot of points that I'd like to address. I'm going to mostly focus on the non-derivative side of the case, if I may, and responding to Mr. McManus's comments. But sticking for a moment with the financial analysis, I want to point out that it's not a matter of a few hundred or thousand dollars that have had to been transferred back. Significantly more. In 2014, there was a $3 million transfer. In 2015, an $8.5 million transfer. And some of those transfers were specifically caused by the need to repay entrance fees. And caused by the state, when it briefly required that there be a reserve for contracts entered into after, I believe it was June 1st, 2014, for a reverse course. Fundamentally, the problem here is, this is not a normal company. This is a senior living retirement community. A very specialized type of retirement community, where residents are wrapping up, in many cases, most of their life savings in order to enter this community. There's a lot at stake for these residents. What I've heard listening this morning, is more of the theme that the residents hear, which is, just trust us. We've always paid, we'll always pay in the future, but no, our parent doesn't owe you any legal obligation. So there's been a separation of assets and liabilities, and a separation of the responsibility to repay the residents here. So your position, as I understand it, is the one provision in the Health and Safety Code that permits a private right of action, abandonment, am I right so far? Yes. You construe abandonment to mean any backing off, or failure to comply with any element of the agreement between the parties. As opposed to the abandonment of the facility. Correct. We believe that the language is broader than just walking away from a CCRC, because the language talks about abandonment, including of obligations under a continuing care contract. It's more than just closing the doors and walking away from the community. It's also abandoning these central obligations that the CCRC has, because it offers refundable contracts. If it didn't, it wouldn't need to keep a reserve, but it does. And again, if I could go back and emphasize that, we're not asking for a tortured reading of whether these contracts are refundable, they're very plainly refundable, because they are absolute, they must be repaid. And there's three different ways to get to finding that there's a private right of action that allows the plaintiffs here to continue. There's the explicit language of the statute, which we were just discussing, there's also the legislative history and an implied private right of action. And thirdly, we brought a UCL claim, and there's good law that for a UCL claim to proceed, you can use a violation of a statute, even if that statute doesn't have a private right of action. Do I understand, just a few seconds ago, that you're arguing because these funds are repayable, that makes them refundable. Is that your argument? No, it's not. The reason why they're refundable is that there's no contingency to the repayment obligation. The specific contracts say that the resident needs to be repaid at the time that the unit is resold, or within 10 years. That's a hard stop. Every one of these residents must be repaid their entrance fee. This isn't a situation where it's completely contingent on whether a particular unit sells in 5 years, 10 years, 20 years. I'd like to use my remaining few seconds to just refocus this argument to what we're dealing with here. We're dealing with a vulnerable population of seniors and a remedial statute. The risk of harm here is not unduly speculative. CCRCs do fail. We have a different view of how comprehensive the continuing care branch's regulation of CCRCs have been. The statute has clearly been designed to provide a reserve specifically to protect the plaintiffs and appellants. Thank you. Okay, thank you. Your time is up. Thank you, counsel. We appreciate your arguments this morning and your willingness to participate in our virtual court. And that concludes our argument for this case. The case is submitted.
judges: Hawkins, Paez, Restani